UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   -v-                                        CASE NO:  3:17-CR-0063

JUSTIN CRANDALL, et al.,
                  Defendants.

# **SENTENCING MEMORANDUM OF DEFENDANT JUSTIN CRANDALL**

DATED:                                            Respectfully submitted,

                                                     LISA A. PEEBLES
                                                     Federal Public Defender

                                   By:    Courtenay K. McKeon, Esq.
                                             Assistant Federal Public Defender
                                             Bar Roll No. 515841
                                             Clinton Exchange, 3rd Floor
                                             4 Clinton Square
                                             Syracuse, New York   13202
                                             (315) 701-0080

On October 27, 2017, defendant Justin Crandall ("Justin") pleaded guilty to one count of Conspiracy to Sexually Exploit a Child (18 U.S.C. § 2251(e)) and two counts of Sexual Exploitation of a Child (18 U.S.C. § 2251(a)). (Dkt. No. 50.) All three counts involve one victim. (Dkt. Nos. 19 and 50). The exploitation occurred during a period of approximately six weeks in early 2017. (Dkt. No. 19.) Justin has no prior documented history of violence or of sexual interest in children. This brief period of reprehensible aberrant behavior occurred mere months after Justin first tried and became addicted to methamphetamine.

Sentencing is scheduled for July 25, 2018. The United States Probation Office prepared a Presentence Investigation Report (*hereinafter* "PSR") on June 26, 2018, in anticipation of sentencing. (Dkt. No. 86.) The PSR sets forth a total offense level of 43, a Criminal History Category of II, and a Guideline sentencing range of 1,080 months. *Id*. ¶¶ 65, 70, 101. The defense has no objection to the calculation of the total offense level or Criminal History Category. As discussed in Section II, however, the defense maintains that the Guideline sentence is life rather than 1,080 months.

Justin respectfully submits this memorandum in support of a below-Guideline sentence of fifteen years' incarceration followed by supervised release.

I.   **FACTUAL BACKGROUND**

Justin Crandall was born in Sidney, New York, in 1988. (Dkt. No. 86 ¶ 74.) Both of his parents struggled with alcoholism. *Id*. ¶¶ 74, 76.  They divorced when Justin was still a toddler. *Id*. Justin's mother, Kelly, remarried during Justin's childhood. *Id*. ¶ 76. Her continued alcohol abuse combined with cocaine use by Justin's stepfather[1] led to a chaotic homelife for Justin. *Id*.

---

[1] Justin's stepfather and Kelly have now been sober for over a decade and are a supportive part of Justin's life. (Dkt. No. 86 ¶ 76.)

1

Justin's mother and stepfather fought constantly. *Id*. They threw things at each other. *Id*. Justin's stepfather verbally abused him. *Id*.

Justin's father, David, began living a sober lifestyle before Justin's mother did. (Dkt. No. 86 ¶¶ 74, 76.) Justin and his father credit David's second wife, Lori, with this change in David's life. *Id*. ¶ 74. Lori was an extremely spiritual person who held the family together. *Id*. When Justin was fourteen years old, he began living primarily with David and Lori. *Id*. In that household, no one ever fought. *Id*. The family, which also included Lori's son, spent quality time together. *Id*. Justin thrived in this atmosphere. School psychologists who evaluated him during this period for learning disabilities described him as a "well-adjusted young man with no significant emotional or behavioral problems" and a "polite, friendly, cooperative young man" who was "a pleasure to have in class." *Id*. ¶ 91. Despite having a Full Scale IQ of 81, in the low average range, Justin scored higher on achievement tests than expected and was considered a candidate for declassification from support services. *Id*.

This all came to an end in 2004, when Justin was sixteen years old. Justin's stepmother, Lori, died from cancer. (Dkt. No. 86 ¶ 74.) The family fell apart. *Id*. Justin's father began to drink again after fourteen years of sobriety. *Id*. Justin began hanging out with bad kids and skipping school. *Id*. He started smoking marijuana and drinking every day. *Id*. ¶ 87. He used cocaine on the weekends. *Id*. The young man who had so recently been described as "polite, friendly, [and] cooperative" got into constant trouble at school. *Id*. ¶ 92. In his final three semesters of high school, he received eleven in-school suspensions and two out-of-school suspensions. *Id*.

It was during this period that Justin met his wife, Jessica. (Dkt. No. 86 ¶ 77.) They have been together, off and on, ever since. *Id*. The relationship has been extremely troubled and

unhealthy for Justin, Jessica, and anyone else with whom they come into contact when together.[2] Many people---both those who sympathize with Jessica and those who sympathize with Justin---use the word "toxic" to describe the relationship. In addition to the emotional toxicity of the relationship, the couple's activities were literally toxic: their presence in each other's lives seemed to spur each of them to greater and greater drug use.

Justin moved in with Jessica and her mother when he turned eighteen. (Dkt. No. 86 ¶ 77.) He began working with Jessica's father in the concrete business. *Id*. Jessica's father was a heavy drinker and Justin drank with him. *Id*. The two of them would split a thirty-pack of beer every day. *Id*. ¶ 87.

In 2008, Justin and Jessica had their first child, a daughter. (Dkt. No. 86 ¶¶ 20, 77-78.) That same year, Justin and Jessica began abusing prescription pain pills together. *Id*. ¶ 87. They started with Vicodin and then moved on to OxyContin. *Id*. ¶¶ 77, 87. It was easy for them to get pills because Jessica worked at the K-Mart pharmacy. *Id*. ¶ 77. Eventually, they became daily users of heroin. *Id*. ¶¶ 77, 87. During this period of heroin abuse, their second child, a son, was born. *Id*. ¶ 78.

Child Protective Services ("CPS") removed the couple's children from them three times: once in July 2010, once in October 2010, and once in July 2013. (Dkt. No. 86 ¶ 79.) Significantly, these CPS actions were based on inadequate guardianship and lack of supervision. *Id*. There were no allegations of violence or abuse.

Similarly, Justin's limited arrest history during that period contains no indication of violence. In March 2013, Justin was pulled over for speeding. (Dkt. No. 86 ¶ 68.) Police found a

---

[2] Jessica's version of the couple's relationship is recounted in Justin's PSR at Paragraph 86. Justin disputes nearly every detail. Because Jessica's PSR is a private document, the undersigned does not know whether Justin's version of events is recounted in Jessica's PSR. It would be fundamentally unfair for the Court to credit Jessica's version when sentencing Justin without considering Justin's version when sentencing Jessica. The defense reserves the right to respond to any allegations about the relationship that are raised in sentencing memoranda filed by the government or by Jessica.

3

hypodermic needle, a crack pipe, and a small baggie of cocaine in the car. *Id*. Justin was sentenced to three years of probation. *Id*. This was his only criminal conviction before his arrest in this matter. Probation referred him to Chenango County Behavioral Health Services in April 2014. *Id*. ¶ 89.  He successfully completed drug and alcohol treatment in November 2014, while Jessica was in state prison.[3] *Id*. His treatment included individual talk therapy and Suboxone. *Id*. Justin credits this treatment with saving his life. *Id*. ¶ 87. In treatment, Justin's focus was on caring for his children and family/parenting/relationship issues. *Id*. ¶ 89. Much like the counselors who dealt with Justin when he was in high school, progress notes indicate that the treatment providers who interacted with Justin found him "pleasant, cooperative, and open" and stated that he had "good insight and judgment." *Id*. ¶ 89.

For approximately the next two years, Justin's focus remained on his children and on building a good life. He rented a home in his hometown of Sidney, New York. (Dkt. No. 86 ¶ 77.)  Jessica was released from jail and the two regained custody of their children. *Id*. Their third child was born in 2016. *Id*. ¶ 78. Justin and Jessica were married on August 27, 2016. *Id*. ¶ 77. Things were going very well for the family. But shortly thereafter, everything changed.

In September 2016, a friend at work offered Justin some methamphetamine and he took a sample home. (Dkt. No. 86 ¶ 87.) He held onto the sample for a few days before he and Jessica "caved in" and used it. *Id*. ¶ 77. Within a few weeks, they were using methamphetamine every day. *Id*. They found that, while high, they could work, clean the house, and take care of the

---

[3] In October 2014, Jessica's probation stemming from a 2011 larceny arrest was revoked and she was sentenced to serve an indeterminate sentence of sixteen months to four years. Jessica was in state prison from October 2014 through May 2015. NEW YORK STATE DEP'T OF CORR. & CMTY. SUPERVISION, INMATE POPULATION INFO. SEARCH, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited July 9, 2018).

4

children without getting tired. *Id*. At one point, Justin remained awake for ten consecutive days. *Id*.

Under the influence of methamphetamine, Justin's behavior changed. (Dkt. No. 86 ¶ 77.) His days were "blurry" and his sex drive "kicked into a whole new level." *Id*. ¶ 12. He became aggressive and found that he liked engaging in taboo behavior. *Id*. ¶ 24. He began acting "crazy." *Id*. ¶ 77. Justin's behavior soon had financial consequences. In December 2016, he was fired from his job at Wagner Lumber in Nineveh, New York, where he had worked since 2011. *Id*. ¶ 94. He and Jessica were not able to afford Christmas presents for their children. They were struggling to put food on the table. Justin's feelings of inadequacy about money added to the methamphetamine-fueled rage he was experiencing.

It was at this time that Justin and Jessica's neighbor asked them to babysit her toddler overnight on Mondays. (Dkt. No. 86 ¶ 9.) The toddler's mother paid Jessica $7 per night. *Id*. ¶ 24. This small amount of money enraged Justin. *Id*. He begrudged every bit of food that the toddler ate at his home, seeing it as food that should be his children's.

What followed was horrific. Beginning in early January 2017, Justin and Jessica sexually abused the toddler who had been left in their care. They documented the abuse in videos and photographs. Justin distributed one of the photographs to a male acquaintance, stating that he hoped to earn money by prostituting the toddler to a rich man.

Justin was arrested approximately six weeks after the abuse began. (Dkt. No. 86 ¶¶ 12-13.) Justin has expressed relief that he was arrested so quickly. *Id*. ¶ 25. In forensic examinations of his phone and computers, the only items of child pornography that were discovered involved the toddler.

5

## II.     THE GUIDELINE SENTENCE IN THIS CASE IS LIFE, NOT 1,080 MONTHS.

The United States Sentencing Commission Guidelines serve as "the starting point and the initial benchmark" for all sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007). Accordingly, it is vital that the Guideline sentence be properly calculated. The PSR calculates the Guideline sentence here as 1,080 months. (Dkt. No. 86 ¶ 101.) That calculation is incorrect.

Several subsections of the Guidelines must be applied to determine the Guideline sentence where, as here, a defendant is guilty of multiple counts. First, under Guideline § 5G1.2(b), "the court shall determine the total punishment and shall impose that total punishment on each count." U.S. Sentencing Guidelines Manual § 5G1.2(b) (U.S. Sentencing Comm'n 2016). The Guidelines define "total punishment" as the total "determined by the court after determining the adjusted combined offense level and the Criminal History Category and determining the defendant's guidelines range on the Sentencing Table in Chapter 5, Part A." U.S. Sentencing Guidelines Manual § 5G1.2 cmt. n.1 (U.S. Sentencing Comm'n 2016). Here, the adjusted combined offense level is 43 (Dkt. No. 86 ¶ 65) and the Criminal History Category is II (*Id.* ¶ 70), resulting in a Sentencing Table range of life. Thus, the "total punishment" for the purposes of Guideline § 5G1.2(b) is life.

The PSR cites no authority for a Guideline sentence of 1,080 months - a sum reached by adding together the statutory maximum term for each count. (Dkt. No. 86 ¶ 101.)  Other reports prepared by the Probation Office cite Guideline 5G1.2(b) to support calculating the Guideline in this fashion. There is no support in the plain language of Guideline § 5G1.2(b) for that position.

The Guidelines' only support for calculating the Guideline in anything like this manner is found in Guideline § 5G1.2(d). Guideline § 5G1.2(d) states that:

> [i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentences imposed on one or more of the other counts shall run consecutively, *but only to the extent necessary to produce a combined sentence equal to the total punishment.* In all other respects, sentences on all counts shall run concurrently.

Sentencing Guidelines Manual § 5G1.2(d) (U.S. Sentencing Comm'n 2016) (emphasis added). The emphasized language expresses the long-standing preference in American courts for concurrent sentences rather than consecutive sentences. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively."); *United States v. Martinez*, 274 F.3d 897, 903 n.5 (5th Cir. 2001) (characterizing § 5G1.2 as "labeling concurrent sentences as the default"); *United States v. Hardrich*, 707 F.2d 992, 993 n.1 (8th Cir. 1983) (noting that the National Advisory Commission on Criminal Justice Standards and Goals "recommends a presumption in favor of concurrent sentences for multiple offenses").

As the plain language of Guideline § 5G1.2(d) makes clear, when imposing a Guideline sentence, the Court is authorized to impose consecutive maximum sentences *only to the extent necessary* to produce a combined sentence of *life*. Nowhere does the Guideline state that the Guideline sentence is determined by adding together the statutory maximums on each count.

The Probation Office frequently cites *United States v. Howells*, 676 F. App'x 55 (2d Cir. Jan. 23, 2017) to support its method of calculating the Guideline in cases such as this. *Howells* is inapposite for three reasons. First, the decision is an unpublished summary order. Under the Second Circuit's rules, as explicitly stated in the very first line of *Howells* itself, summary orders do not have precedential effect. Second, the Second Circuit---rather than adopting the PSR's calculation that Howells' Guideline sentence was 6,960 months---characterized the proper

7

Guideline sentence as "life." *Id*. at 57 ("The Guidelines offense level for this criminal conduct far exceeded 43, the maximum level, which, even with Howells' criminal history category of I, yielded a recommended—and here undisputed—Guidelines sentence of life imprisonment."). Third, the Second Circuit found that, despite varying statements by the district court judge during sentencing, the district court had determined that the Guideline sentence was "life" rather than 6,960 months. *Id*. at 58. ("[T]he district court did properly determine Howells' Guidelines range here as life imprisonment.").

Accordingly, the Guideline sentence in this case is life rather than 1,080 months. There are two different standards the Court could consult to determine the length of a life sentence in years or months. First, the United States Sentencing Commission defines a life sentence as 470 months (39.2 years). United States Sentencing Commission, *Life Sentences in the Federal System*, (Feb. 2015). Second, the Social Security Administration calculates that a man, like Justin, born in June 1988, can expect to live, on average, until age 82. SOCIAL SECURITY ADMINISTRATION, CALCULATORS: LIFE EXPECTANCY, https://www.ssa.gov/OACT/population/longevity.html. A life sentence, then, would be a sentence of 52 years (624 months). *Id*. The Court could use either of these rubrics or some other method to determine the length in months or years of a "life" sentence. The Court would then "stack" consecutive sentences *only to the extent necessary to reach that total.* For example, under either of the proposed rubrics, the Court would impose consecutive thirty-year sentences on Counts One and Two along with a concurrent sentence on Count Four. Contrary to the PSR's assertion, it is not necessary to impose consecutive maximum sentences on each count to achieve a Guideline sentence.

## III. THE 18 U.S.C. § 3553(a) FACTORS WEIGH IN FAVOR OF A BELOW-GUIDELINE SENTENCE

Although, as discussed above, properly calculating the Guideline sentence is vitally important, it is only the first step in the sentencing process. After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing Guidelines are advisory rather than mandatory. Therefore, in determining a sentence, a court must equally consider the Guideline calculations, the unique characteristics of the defendant, and the other statutory concerns listed in 18 U.S.C. § 3553(a), specifically:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed
  (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) To afford adequate deterrence to criminal conduct;
  (C) To protect the public from further crimes of the defendant; and
  (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Here, each of those factors weigh in favor of imposing a below-Guideline sentence.

### A. While the Non-Homicide Offenses Here Are Extremely Serious, Supreme Court Precedent Holds That the Longest Sentences Should Be Reserved for Homicide Offenses.

The first factor that the Court must consider is the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). The offense here is extremely serious. The videos that Justin created are profoundly disturbing. But as the Supreme Court has observed, "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham v. Florida*, 560 U.S. 48, 69 (2010). As the Supreme Court explained:

> There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm[,] but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared

9

>  to murder in their severity and irrevocability. This is because life is
>  over for the victim of the murderer, but for the victim of even a
>  very serious nonhomicide crime, life is not over and normally is
>  not beyond repair. Although an offense like robbery or rape is a
>  serious crime deserving serious punishment, those crimes differ
>  from homicide crimes in a moral sense.

*Id*. (citations, alterations, and internal quotations marks omitted).

Justin's conduct, while reprehensible, does not merit a sentence that is decades longer than the sentences routinely imposed on murderers. *See, e.g*., *United States v. Yankton*, 734 F.3d 828 (8th Cir. 2013) (360-month sentence for second-degree murder); *United States v. Maxwell*, 664 F.3d 240 (8th Cir. 2011) (121-month and 222-month sentences for second-degree murder); *United States v. Grant*, 563 F.3d 385 (8th Cir. 2009) (180-month sentence for second-degree murder); *United States v. Siting Bear*, 436 F.3d 929 (8th Cir. 2006) (228-month sentences for second-degree murder). Accordingly, this factor weighs in favor of imposing a below-Guideline sentence.

### B. A Below-Guideline Sentence is Warranted Because Justin's Conduct was Aberrant and Strongly Linked to His Addiction to Methamphetamine.

The second statutory factor that the Court must consider is the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Here, this factor weighs in favor of a below-Guideline sentence because Justin's conduct was aberrant and strongly linked to his addiction to methamphetamine.

Until he began using methamphetamine in September 2016, Justin was a troubled but productive and non-violent member of society.  He graduated from high school, overcoming personal tragedy (the death of his beloved stepmother) and deficits in his objective abilities (his low IQ) to do so. He maintained steady employment. He successfully completed drug treatment for heroin addiction. Counselors during his childhood, teens, and early twenties found him to be polite, cooperative, and self-aware. His only arrest before he was arrested in connection with this

case was for drug possession. He was never arrested for assault, violating an order of protection, or any of the other types of violent behavior that regularly appear on the rap sheets of people who are in relationships as turbulent as Justin and Jessica's. He had never been sentenced to any period of incarceration. There is absolutely no indication that he had any sexual interest in children. He did not collect child pornography. He was never so much as accused of physically or sexually abusing his own children. His conduct in this case, therefore, is extremely aberrant. In such circumstances, below-Guideline sentences are appropriate. *See United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (where defendant pled guilty to possession of a firearm by a prohibited person, the district court did not abuse its discretion in departing downward by three levels to probation when, as one of eleven factors, it considered that crime was aberrant conduct where the defendant had been law abiding until age 35 when his marriage disintegrated); *United States v. Hued*, 338 F. Supp. 2d 453 (S.D.N.Y. 2004) (where defendant pled guilty to making maintaining a place to store heroin, downward departure of eleven levels granted for aberrant conduct because she "was never actively involved in the planning of the criminal conduct" and her conduct was of "limited duration" and "a marked deviation from an otherwise law-abiding life."); *United States v. Patillo*, 817 F. Supp. 839 (C.D. Cal. 1993) (first time offense, possession of 681 grams of crack, "out of character" for defendant who had stable employment history and acted in a moment of "financial weakness" and "unusual temptation.")

      Justin's behavior changed drastically when he began using methamphetamine. Such behavioral changes are commonly linked to methamphetamine use. In study after study, including those cited in the discussion below, methamphetamine use is tied to increased violence. The connection between methamphetamine and violence is far stronger than the connection between violence and Justin's previous drugs of choice—alcohol, marijuana, heroin, and cocaine. One study on the links between methamphetamine and violence, for example, found

11

that "even after adjusting for demographic characteristics and use of other substances including alcohol, heroin and crack/cocaine, the odds of committing a homicide are nearly nine times greater for those who use methamphetamine compared to those who do not." P.B. Stretesky, *National case-control study of homicide offending and methamphetamine use*, 24 J. Interpersonal Violence 911, 924 (2009).

This increase in violence among methamphetamine users is tied to the drug's effects on the user's brain. Methamphetamine users experience losses in key neural receptors, which increases their impulsive responses. Buyean Lee, et al., *Striatal Dopamine D2/D3 Receptor Availability is Reduced in Methamphetamine Dependence and is Linked to Impulsivity*, 29 J. Neuroscience 14, 734 (2009). In addition, methamphetamine addicts "show severe structural, neurochemical, and metabolic abnormalities" in the neural circuitry between the amygdala and prefrontal cortex. Meredith Cusick, *Mens Rea and Methamphetamine: High Time for a Modern Doctrine Acknowledging the Neuroscience of Addiction*, 85 Fordham L. Rev. 2417, 2433 (Apr. 2017). Such defects are associated with aggression. *Id*. Methamphetamine also affects the firing of dopamine neurons. Min Lin, et al., *Methamphetamine Regulation of Firing Activity of Dopamine Neurons*, 36 J. Neuroscience 10, 376 (2016). "When the number of dopamine transporter molecules diminishes, so does the amount of dopamine that the brain can store. This reduction can lead to various psychiatric symptoms, including . . . violent behavior, an inability to experience pleasure, and increased vulnerability to external psychological stressors." Stephanie C. LoConto, *Methamphetamine: the physical effects*, Prosecutor (Mar.-Apr. 2007) at 30-31. Loss of dopamine also contributes to high impulsivity and lack of inhibition control. Cusick, 85 Fordham L. Rev. at 2432. The results, commonly, are hypersexuality and aggression. Becky Dunlap, *Porn, Meth & Violence: Making Some Connections*, Crisis Connection.

Methamphetamine is a psychostimulant drug, which places it in the same class of drugs as cocaine. Alistair M. Barr, et al., *The Need for Speed: An Update on Methamphetamine Addiction*, 31 J. Psychiatry & Neuroscience 301 (2006). However, methamphetamine's effects on the brain are far more pernicious than cocaine's. Cocaine primarily affects one biological pathway, but methamphetamine affects multiple pathways. Cusick, 85 Fordham L. Rev. at 2427. Methamphetamine's elimination half-life is longer than cocaine's, so the behavioral and psychological effects of methamphetamine last significantly longer. *Id*. Moreover, methamphetamine penetrates the central nervous system far more effectively than cocaine does. *Id*.

Here, Justin's conduct changed drastically as the result of his methamphetamine addiction. He began to behave in ways that he had never behaved before—even when he was under the influence of other drugs. This is demonstrated not merely by Justin's own report that he began acting "crazy." (Dkt. No. 86 ¶ 77.) It objectively demonstrated by Justin's rap sheet and employment record. As discussed above, Justin remained gainfully employed and non-violent through long periods of addiction to other drugs, a troubling childhood, and a turbulent relationship. It was only when he became addicted to methamphetamine that his behavior escalated into the deeply disturbing conduct that is now before the Court. A below-Guideline sentence is appropriate where a defendant commits a crime as the result of addiction. *United States v. Ilayayev*, 800 F. Supp. 2d 417, 452 (E.D.N.Y. 2011) ("Where drug addiction of the defendant is causatively intertwined with a violation of criminal law, every effort should be made to minimize incarceration in favor of a closely supervised, intensive medical treatment regime outside of prison. Outpatient treatment is preferred, permitting the defendant to be more readily integrated into a drug-free productive lifestyle in the community."). Therefore, this factor weighs in favor of a below-Guideline sentence.

**C. A Below-Guideline Sentence Would Adequately Deter Criminal Conduct.**

Another factor that the Court must consider is deterrence. 18 U.S.C. § 3553(a)(2)(B). A below-Guideline sentence would be sufficient to afford adequate deterrence to criminal conduct. Studies of the deterrent effect of prison sentences have found that it is the prosecution of crime, rather than the sentence imposed, that has the strongest deterrent effect. In one of the best studies of specific deterrence, which involved federal white-collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment. Another study by the Institute of Criminology at Cambridge University examined the effects of changes to both the *certainty* and the *severity* of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). Here, Justin was swiftly prosecuted and will certainly be punished. This swift prosecution and certain punishment will strongly deter criminal conduct by other members of the community. A sentence longer than the statutory mandatory minimum of fifteen years is not necessary to achieve that goal. Accordingly, this factor weighs in favor of the Court imposing a below-Guideline sentence.

**D. A Below-Guideline Sentence Would Be Sufficient to Address the Potential for Recidivism.**

Another factor that the Court must consider in sentencing is the need to prevent recidivism. 18 U.S.C. § 3553(a)(2)(C). A Guideline sentence is not necessary to protect the public from future crimes by Justin. Although the Supreme Court has stated that sex offenders have a recidivism rate "as high as 80%," that figure has recently been shown to have been derived from one unscientifically supported article in a 1986 edition of Psychology Today, which

14

the author himself has since repudiated. David Feige, *When Junk Science About Sex Offenders Infects the Supreme Court*, N.Y. Times, Sept. 12, 2017, found at https://www.nytimes.com/2017/09/12/opinion/when-junk-science-about-sex-offenders-infects-the-supreme-court.html; Joshua Vaughn, *Closer Look: Finding Statistics to Fit a Narrative*, The Sentinel, Mar. 25, 2016, found at http://cumberlink.com/news/local/closer_look/closer-look-finding-statistics-to-fit-a-narrative/article_7c4cf648-0999-5efc-ae6a-26f4b7b529c2.html. Moreover, even if the now-debunked recidivism rate for sex offenders was accurate, it would not apply in this case. Justin does not exhibit many of the characteristics commonly present in sex offenders. He did not have a collection of child pornography. He has not previously been accused of sexual abuse. He has never expressed any sexual attraction to children. As discussed above, Justin's crimes stemmed largely from his addiction to methamphetamine. Justin fits the profile of a drug abuser far more than he fits the profile of a sex offender, despite his terrible actions during one six-week period. Sentences for drug offenses are frequently far shorter than the fifteen-year mandatory minimum sentence that applies in this case. These shorter sentences adequately protect the public from recidivism. Therefore, this factor weighs in favor of a below-Guideline sentence.

    **E. A Below-Guideline Sentence Would Better Provide Justin With Needed Rehabilitation.**

The final factor that the Court must consider is the need "[t]o provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Justin requires significant substance abuse treatment to halt the cycle of addiction that has been part of his life since his stepmother died. It is also likely that Justin could benefit from mental health treatment to explore the emotional and psychological triggers for his addiction. Such treatment is not widely available in prison. A July 2017 report by the Department of Justice's Office of the Inspector General found that only 3% of

15

federal inmates receive mental health treatment on a regular basis. DEPT. OF JUST., OFF. OF THE INSPECTOR GENERAL, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, https://oig.justice.gov/reports/2017/e1705.pdf (Jul. 2017). Long waits for the limited drug treatment programs available to federal prisoners are well documented, although there has not been an official government study of the issue in the past five years. *See, e.g.*, Kevin Johnson, *Prisoners Face Long Wait for Prison Rehab Services*, https://www.usatoday.com/story/news/nation/2012/12/04/prisoner-drug-treatment-delays/1739371/ (Dec. 4, 2012). The need for therapy and rehabilitation is a commonly-recognized justification for imposing a below-Guideline sentence. *See United States v. Olhovsky* 562 F.3d 530 (3d Cir. 2009)(where defendant convicted of possession of porn., district court's below-guideline sentence of 72 months unreasonably high in part because the record did not reflect the reasons for the court's " believing that treatment in prison would "provide . . .correctional treatment in the most effective manner."); *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008)  (where defendant convicted of possession of child porn and guidelines 33-40 months, district court's sentence to probation reasonable in part "Because of the district court's strong emphasis on [Duhon's] general need for treatment"); *United States v. Cherry*, 487 F.3d 366 (6th Cir. 2007)  (where defendant convicted of possessing child pornography and guideline range was 210-262 months, sentence of 120 months (43% variance from guidelines) was proper in part because defendant wanted to continue counseling and treatment but nothing available in prison). Therefore, this factor weighs in favor of a below-Guideline sentence.

## IV.    CONCLUSION

Justin Crandall has pleaded guilty to and accepted responsibility for committing horrific crimes. However, the objective facts of his life---including his school record, employment history, arrest record, and even investigations by CPS--- demonstrate that Justin does not have a

general propensity for violence. The terrible things he did over the six-week period that is at issue in the case occurred only after he became addicted to methamphetamine. The statutory minimum sentence that he faces ---fifteen years in prison--- is significant. It is a sentence far longer than most drug offenders and even some murderers receive. It is sufficient, but not greater than necessary, to meet the statutory goals of sentencing. Therefore, the defense respectfully requests that the Court impose a below-Guideline sentence of fifteen years of imprisonment followed by supervised release.

DATED: July 10, 2018

LISA A. PEEBLES
FEDERAL PUBLIC DEFENDER

By: */s/ Courtenay K. McKeon, Esq.*
Assistant Federal Public Defender
Bar Roll No. 515841
Clinton Exchange, 3rd Floor
4 Clinton Street
Syracuse, New York   13202
(315) 701-0080

To: Miroslav Lovric, AUSA (via ECF)
Janna A. Kulakowski, USPO (via email)
Justin Crandall, Delaware County Jail (via mail)

17